UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JUDITH A. LENTNER,            )
                             )
            Plaintiff         )
                             )
        v.                    )   Case No. 2:03 cv 516
                             )
COMMISSIONER OF SOCIAL SECURITY )
                             )
            Defendant         )

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the appellant, Judith Lentner, on April 1, 2004.  For the reasons set forth below, the motion is **GRANTED**.

Background

The plaintiff, Judith Lentner, initially applied for Disability Insurance Benefits on October 10, 2000, alleging a disability onset date of April 19, 1994.  (Tr. 69) The claim was denied initially on January 4, 2001 and upon reconsideration on May 28, 2001.  (Tr. 60, 62) Lentner requested a hearing before an Administrative Law Judge ("ALJ") on July 23, 2001, and a hearing was held before ALJ Richard VerWiebe on June 5, 2002.   (Tr. 25, 66) Subsequent to the hearing in which Lentner and her husband, Frank Lentner testified, the ALJ denied Lentner's application by written decision dated August 27, 2002.  (Tr. 9-18) Following a denial of her request for review by the Appeals Council on September 5, 2003, Lentner filed a complaint in this court on December 4, 2003.  (Tr. 4) Because Lentner's coverage for disability benefits expired on December 31, 1999, the court now must

determine whether the ALJ erred in finding Lentner not disabled as of that date.  *See* 20 C.F.R. ß404.315.  *See also* **Ottman v. Barnhart**, 306 F.Supp.2d 829, 836-37 (N.D. Ind. 2004).

Lentner was born in Kankakee, Illinois on June 23, 1949, and was 50 years old when her eligibility for benefits expired.  (Tr. 29) She is 5'2" tall and weighs approximately 225 pounds, as she did in 1999.  (Tr. 29, 221) She married Frank Lentner in 1994 and was living with Frank and his teenage daughter in the 1990s. (Tr. 37, 130) Lentner has a high school education, several semesters of college, and worked as a railroad clerk from 1988 to 1994.  (Tr. 29, 31) Although the ALJ did not inquire into Lentner's job requirements during the hearing, Lentner described her responsibilities as "typing, processing train orders, walk tracks and check trains, drive crew bus, deliver orders to train" in a September 27, 2000 Disability Report.  (Tr. 79) In that report, Lentner stated that as a railroad clerk she had to walk for one and one-half hours, stand for two and one-half hours, stoop for one and one-quarter hours, write, type, or handle small objects for at least eight hours, frequently lift 10 pounds, and lift 15 pounds at most.  (Tr. 79) Lentner claims that fibromyalgia, arthritis, depression, migraine headaches, and hypothyroidism eventually forced her to quit working in April 1994.  (Tr. 78)

Dr. Arjun Gupta was one of Lentner's primary care physicians from March 3, 1994 through June 7, 1999.  (Tr. 138-201) From March 4, 1994 through February 15, 1996, Dr. Gupta treated Lentner multiple times for headaches and hypothyroidism.  (Tr.

193-201) Dr. Gupta primarily prescribed Levoxyl to treat the
hypothyroidism. (Tr. 150-53, 161) With respect to Lentner's
headaches, Dr. Gupta initially prescribed 10 mg. Toradal, which
Lentner took from at least December 1994 through March 1995.
(Tr. 197-99) On February 17, 1995, Dr. Gupta noted that he had
referred Lentner to Dr. Daksha Vayas, who had run "many tests,"
including a brain CAT scan. (Tr. 197) However, the results f
these tests do not appear in the record. (Tr. 247) Dr. Gupta
also opined that the headaches were likely from cervical spinous
arthritis and stated that he would need to review x-rays and take
an MRI of Lentner's cervical spine, the results of which also do
not appear in the record. (Tr. 197) On March 12, 1995, Dr. Gupta
switched Lentner from Toradal to 50 mg. of Cataflam, which she
took along with occasional prescriptions for Ibuprofin and
Vicodin until November 1997. (Tr. 168-96) In April 1995, Dr.
Gupta also prescribed a soft collar cervical brace. (Tr. 196) On
August 6, 1996, Lentner saw Dr. Gupta for left knee cracking and
soreness, coupled with joint, shoulder, foot, and wrist cracking.
(Tr. 185)

    In October 1996, Dr. Gupta diagnosed Lentner with fibromyal-
gia and depression. (Tr. 182) He prescribed Zoloft and Levoxyl
for the depression, which made Lentner feel "somewhat better."
(Tr. 180-82) He later added Elavil to Lentner's depression
medications. (Tr. 164) On March 21, 1997, Dr. Gupta noted that
Lentner continued to complain about "aches and pains all over."
(Tr. 179) He also completed a form for Food Stamp eligibility

3

stating that Lentner was temporarily disabled for at least 12 months as a result of her hypothyroidism, depression, and arthritis.  (Tr. 178)

On November 4, 1997, Dr. Gupta switched Lentner's pain medication from Cataflam to Naproxen.  (Tr. 167) On March 17, 1998, Dr. Gupta again noted that Lentner complained of body aches, joint pain, right shoulder pain, and back pain.  (Tr. 161) He completed a second Food Stamp form in which he stated that Lentner was permanently disabled because of her depression, arthritis, hypothyroidism, and anxiety.  (Tr. 160) On April 14, 1998, Dr. Gupta treated Lentner for low back pain and stiffness but found no back tenderness or deformity.  (Tr. 159) On November 11, 1998, Lentner returned to Dr. Gupta for "sharp pains all over" with ankle and wrist pain and weakness, as well as lower back pain.  (Tr. 150) Dr. Gupta found that Lentner had increasing symptoms of pain and weakness in both forearms and hands with carpal tunnel symptoms.  (Tr. 150) Upon Dr. Gupta's recommendation, Lentner underwent an EMG of both arms, which suggested "bilateral mild sensory carpal tunnel syndromes as well as nonlocalized sensory motor axonal ulnar neuropathy on the right side." (Tr. 147) Dr. Gupta also started Lentner on 500 mg. of the anti-inflammatory Relafen on November 19, 1998.  (Tr. 144)

In addition to Dr. Gupta, Lentner also received treatment from a free clinic called Hilltop Neighborhood House beginning in 1996.  (Tr. 211) However, the Hilltop records do not provide any commentary on Lentner's condition until December 7, 1998, when

4

Lentner complained about diffuse body pain, as well as aching and stiffness in her hands.  (Tr. 234) On January 20, 1999, a Hilltop physician discussed treatment options for fibromyalgia with Frank Lentner and prescribed Neurontin.  (Tr. 234) On February 2, 1999, Lentner reported "marked improvement" in her symptoms since starting the Neurontin, including an increase in mobility, activities of daily living, and household chores.  (Tr. 232) However, on March 4, 1999, Lentner returned to Dr. Gupta complaining of headaches that were lasting about three days and causing her to feel nauseated.  (Tr. 13) Dr. Gupta's notes indicate that Lentner had two such headaches in the last month, which appeared to stem from her neck and cause pain on one side of the head or the other.  (Tr. 131) Dr. Gupta prescribed Anaprox for the pain.  (Tr. 131) On March 30, 1999, Lentner underwent an x-ray of her lumbar spine, which showed degenerative changes with minimal scoliosis.  (Tr. 205) On April 15, 1999, Lentner began walking on a treadmill for 20 minutes three times a week.  (Tr. 221)

Rheumatologist Dr. Karen Kovalow-St. John treated Lentner from March 11, 1999 through October 12, 2001.  (Tr. 347-63) In an initial evaluation on March 11, 1999, Lentner reported to Dr. Kovalow-St. John that she was experiencing one or two headaches a month that lasted several days, had a stiff neck and shoulders, had chronic low back pain, and painful feet in the morning for about 30-45 minutes.  (Tr. 362) Lentner also told Dr. Kovalow-St. John that she had pain in her wrists and hands for a week, which

5

had improved, that she wore wrist splints at night, and that she was having difficulty sleeping. (Tr. 262) Upon examination, Dr. Kovalow-St. John found that Lentner had a normal range of motion in her neck, although it was antalgic, "tenderness around her shoulder girdle, upper and medial borders of scapula," and that she had "multiple tender points over her lumbosacral spine." (Tr. 363) Dr. Kovalow-St. John diagnosed Lentner with fibromyalgia, for which she found Lentner's medication to be "excellent," and recommended that Lentner try physical therapy and psychological counseling. (Tr. 363) On November 10, 1999, Hilltop House completed a referral to Dr. Kovalow-St. John. (Tr. 213) That day, Dr. Kovalow-St. John met with Lentner a second time and recorded that Lentner was exercising "50 minutes a day three times a week" and feeling much better, although she still had multiple tender points in her back. (Tr. 360) Dr. Kovalow-St. John also noted that Lentner had not done the physical therapy that she had recommended because Lentner could not do that through the Hilltop House. (Tr. 360)

On March 16, 2000, Lentner returned to Hilltop House complaining of pain in her left knee when kneeling. (Tr. 213) She reported falling on her knee two weeks earlier. (Tr. 213) An examination yielded tenderness upon pushing the patella, but an x-ray taken March 16, 2000 showed no fracture or dislocation. (Tr. 217) On March 23, 2000, Dr. Kovalow-St. John found multiple soft tissue tender points over Lentner's back but full range of motion. (Tr. 361) She decided to switch Lentner's depression

6

medication from Zoloft to Prozac because Prozac would work better
with the Elavil and Neurontin that Lentner was taking.  (Tr. 361)
At Lentner's request, she also wrote Lentner a second prescrip-
tion for physical therapy because Hilltop House now would provide
the therapy.  (Tr. 361)

Lentner began aquatic physical therapy on April 3, 2000
through NovaCare.  (Tr. 331) By June 15, 2000, Lentner was doing
30 minutes of aquatic therapy two times a week, which had "con-
siderably" improved her range of motion and velocity of ambula-
tion.  (Tr. 330) Therapist Teri Cooley believed that continued
pool exercises would decrease Lentner's pain level.  (Tr. 330) On
June 26, 2000, Lentner began to attend therapy three times a
week.  (Tr. 329) Therapy notes from July 2000 consistently state
that Lentner was doing well with her program.  (Tr. 318) However,
on July 11, 2000, Hilltop House records indicate that Lentner had
been experiencing right heel numbness and tingling radiating up
into her right calf for the past three weeks.  (Tr. 213) On July
20, 2000, Lentner returned to Dr. Kovalow-St. John with the same
complaint.  (Tr. 359-60) Dr. Kovalow-St. John noted that Lentner
complained of stiff and sore feet in the morning and after
sitting for a long period of time, numbness and pain in her left
foot, neck pain, and upper back pain.  (Tr. 359) Dr. Kovalow-St.
John did not find any swelling or loss of motion, but she noted
heel and foot tenderness upon examination.  (Tr. 359)

From August through September 8, 2000, Lentner continued
with aquatic exercise 30 minutes three times a week and added

7

swimming laps to her program.  (Tr. 305-18) On August 18, 2000,
Lentner increased her exercise to 60 minutes, which she main-
tained until November 6, 2000, despite her increasing reports of
stiffness and soreness in various parts of her body.  (Tr. 290-
311) Lentner then appears to have stopped attending physical
therapy, as the record contains six "no shows" between November
15, 2000 and January 17, 2001.  (Tr. 286-88) On January 17, 2001,
therapist Cooley stated that around November 2000, she had
attempted to increase the therapy on the universal machines and
decrease Lentner's aquatic exercise, but that the switch caused
Lentner great stress and resulted in "numerous complaints."  (Tr.
285) Cooley stated that she did not believe Lentner pushed for
her full potential.  (Tr. 285)

     Psychologist Dr. Mary Zemansky treated Lentner from March
14, 2000 through at least December 7, 2000.  (Tr. 256) At some
point after November 16, 2000, Dr. Zemansky completed a Report of
Psychiatric Status diagnosing Lentner with dysthemic disorder,
adjustment disorder, and fibromyalgia with an onset date for
these disorders of 1997.  (Tr. 249) Dr. Zemansky noted that
Lentner was frustrated with her inability to work due to her
medical problems, which were only partially relieved through
medication and therapy.  (Tr. 250) She opined that Lentner was
capable of independently performing all of her activities of
daily living as well as light household tasks, that she could
manage bill-paying, but that she had limits for standing toler-
ance and for lifting and pushing.  (Tr. 253) She found that

8

Lentner would need "frequent breaks, rest periods, and flexible
scheduling" and that she "could not necessarily handle 8-hour day
on regular basis." (Tr. 253) On December 7, 2000, Dr. Zemansky
summarized a number of life stressors, including marital tension
and lack of support, and noted that Lentner would be continuing
bi-monthly individual therapy. (Tr. 256)

In November 2000, Frank and Judy Lentner both completed
physical activity questionnaires for the Disability Determination
Bureau. (Tr. 87-99) In her questionnaire, Lentner stated that
she did not do any yard work, completed all other activities at a
slower pace, and required breaks of five minutes to an hour
between activities depending on the activity and her body. (Tr.
92) She stated that she could lift and carry about 10 pounds and
walk up to two blocks before pain caused her to stop and that she
could not jog, run, kneel, or sit on the floor. (Tr. 92) Lentner
described her day as largely spent off her feet and treating her
body with hot packs, a heating pad, a soft cervical collar,
analgesic lotion, massage, hot showers, and a vibrating body mat.
(Tr. 93) She incorporated errands into her trips to physical
therapy because driving caused discomfort. (Tr. 93) Frank
Lentner confirmed Judy's statements that she cleaned sporadically
throughout the week by doing a little at a time, would do a load
of laundry each day, and needed help with housework and errands,
shopping, and seeking pain relief through massage. (Tr. 88) Judy
Lentner also completed a Headache Description Questionnaire in
November 2000 in which she described migraine headaches beginning

9

in 1993 that would last 2-3 days and that would usually incapacitate her and occasionally cause her to be nauseous.  (Tr. 100)

On January 18, 2001, Dr. Kovalow-St. John stated that Lentner felt fine if she did pool therapy three times a week and noted that the therapists had been trying to move Lentner's therapy outside the pool.  (Tr. 359) Dr. Kovalow-St. John further stated, "The report we get is perhaps she has not been as compliant as she lets on, and there has been some rudeness to both the staff and other patients.  The patient denies this vehemently." (Tr. 356) The doctor concluded that Lentner was doing as well as she had seen, with no swelling, tenderness, or loss of motion in her upper or lower extremities.  (Tr. 356) Dr. Kovalow-St. John decided to terminate therapy and recommend the YMCA pool program in its place.  (Tr. 356)

On April 10, 2001, Lentner returned to Dr. Kovalow-St. John for low back pain.  (Tr. 353) The doctor found Lentner "exquisitely tender over her SI joints and trochanteric bursae bilaterally" and believed the pain to be a flare up of the fibromyalgia. (Tr. 353) An x-ray taken that day showed "developmental canal stenosis with minimal superimposed degenerative changes."  (Tr. 354) Finally, on August 14, 2001, Dr. Kovalow-St. John noted that Lentner had "multiple soft tissue tender points over her back, and is exquisitely tender over her left SI joint and left trochanteric bursa."  (Tr. 349) She recommended an epidural steroid injection and gave Lentner an injection of Depo-Medrol

10

plus Lidocaine. (Tr. 349) She noted that Lentner was continuing her water aerobics. (Tr. 350)

On January 9, 2001, evaluating physician Dr. R. Klion completed a Psychiatric Review Technique for April 19, 1994 to December 31, 1999, in which he concluded that Lentner had depressive syndrome but that there was insufficient evidence to determine its impact on her. (Tr. 257-70) The same day, evaluating physician Dr. R. Fife completed a Residual Functional Capacity Assessment (RFC) through December 31, 1999. (Tr. 271-78) Dr. Fife concluded that Lentner had unlimited ability to push or pull, occasionally could lift 50 pounds, frequently lift 25 pounds, and could stand, walk, or sit about six hours in an eight hour day. (Tr. 272) Dr. Fife also found that Lentner had frequent limitations in climbing or using stairs and occasional limitations in all other postures and that Lentner was only partially credible because the medical evidence did not support her allegations of severity. (Tr. 276)

On May 14, 2001, Dr. Zemansky completed a second Report of Psychiatric Status in which she stated that Lentner had a GAF of 68 and "great difficulty copying," but that she still was independent in her activities of daily living, had an adequate stress tolerance, and had a "fair" prognosis. (Tr. 345) Dr. Zemansky also noted that Lentner could cognitively perform a simple work routine but that her physical participation would be limited by pain. (Tr. 344)

11

In April 2001, Frank and Judy Lentner completed a second set
of Daily Activity Questionnaires.  (Tr. 113-21) Their responses
essentially repeated the same activities and limitations the
Lentners described in November 2000 with further detail on how
Judy would break tasks down to accomplish them.  (Tr. 113-21)

During the ALJ hearing on June 5, 2002, Lentner testified
that her physical problems began in 1994 with recurrent migraine
headaches that would occur three or four times a month for
between one and one-half to four days, as well as constant back
pain, overall body pain, and extreme fatigue.  (Tr. 32-36) She
stated that she was tired all day, but that she could make
herself do a load of laundry, occasionally vacuum or mop, drive
herself, and shop and cook some, although her husband cooked most
meals.  (Tr. 36-40) She stated that she would attend physical
therapy three times a week for 45 minutes.  (Tr. 39-40) Lentner
testified that she could not return to her previous job because
the pain at the "trigger points" which characterize fibromyalgia,
as well as the pain and weakness in her hands and wrists, would
distract her.  (Tr. 41) She also testified that the pain in her
legs and left knee, which had started around 2001, prevented her
from walking more than a block, that she could force herself to
walk through a grocery store, and that she could walk several
blocks if she had to.  (Tr. 43-46) She stated that she would fall
about once a month since approximately 2000 because she would
trip over her feet.  (Tr. 47) She also said that since 1999 or
2000, sitting would cause her back to hurt after about 10 or 15

12

minutes, so she would shift weight or walk around to relieve the pain. (Tr. 48) Finally, she testified that the pain distracted her and reduced her concentration so that her reading speed had slowed by 25 or 50% and it took her twice as long to do activities. (Tr. 48-52)

After Lentner, Frank Lentner testified that he gave his wife massages every day and had taken over the laundry. (Tr. 54-55) He stated that Lentner was able to function and stay mobile so long as she swam but that no part of their lives had been unaffected by her condition. (Tr. 57) After the hearing, Lentner submitted additional progress notes, x-rays and lab reports from 2000 through 2002, but these records do not pertain to the period before December 31, 1999. (Tr. 364-85)

In his decision finding Lentner not disabled, ALJ VerWiebe found that Lentner's fibromyalgia was a severe impairment but that she could perform her previous work as a railroad clerk. (Tr. 15-18) In reaching this conclusion, the ALJ considered Dr. Gupta's treatment of Lentner from 1994 through 1999, including the EMG reflecting carpal tunnel syndrome in 1998 and the x-ray taken in 1999 showing degenerative changes and minimal scoliosis in Lentner's lumbar spine. (Tr. 16) ALJ VerWiebe stated that Dr. Gupta's prescription for Neurontin in 1998 was the first treatment for fibromyalgia in the record. (Tr. 16) He also considered Lentner's statements to Dr. Gupta that she was walking on a treadmill for 20 minutes three times a week and that the Neurontin was "really working." (Tr. 17) In addition, ALJ VerWiebe

13

considered Lentner's therapy progress notes stating "While the
claimant claimed total compliance, Nova records show noncompli-
ance and rudeness to the staff and other patients." (Tr. 17)

Next, ALJ VerWiebe found that Lentner's headaches were not a
severe impairment despite Lentner's testimony that she had three
or four headaches each month. (Tr. 17) In support of this
statement, the ALJ noted that the evidence showed no diagnosis
for migraines, that the headaches were determined to be connected
to her neck rather than of vascular origin, that she was not
treated with strong medication, that Lentner had few complaints
prior to 1999, and that there was no evidence that she could not
function because of them. (Tr. 17)

Finally, ALJ VerWiebe concluded that although Lentner
testified that she had "back pain, extreme fatigue, pain in her
hands and wrists" and that she could walk less than one block and
sit no more than 10 minutes, the evidence from the relevant
period indicated only vague complaints of tiredness and affirmed
that Lentner could exercise on a treadmill for 50 minutes three
times a week, that she was improving with therapy, that she had
no swelling or loss of motion, and that she could do all that she
needed to at home. (Tr. 17) The ALJ found that the evidence only
reflected an inability to lift and carry "heavy weights" and "the
inability to perform prolonged standing and/or walking even
though she had full ranges of motion and normal gait." (Tr. 17)
Therefore, the ALJ concluded that during the relevant time
period, Lentner had an RFC to "lift and carry 10-20 pounds, and

14

sit for prolonged periods.  She can stand and walk for short periods." (Tr. 18) Thus, the ALJ found that Lentner could perform her past work as a railroad clerk.  (Tr. 18)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. ß 405(g)  ("The findings of the Secretary, as to any fact, if supported by substantial evidence, shall be conclusive."); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct 1420, 1427, 28 L.Ed.2d 852 (1972) (*quoting* *Consolidated Edison Company v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).  *See also* *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002); *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995).  An ALJís decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Golembiewski*, 322 F.3d at 915; *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

15

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act   The claimant must show that she is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

> 42 U.S.C. ß 423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-tial evaluation to be followed when determining whether a claim-ant has met the burden of establishing disability.  20 C.F.R. ß 404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. ß 404.1520(b).  If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combi-nation of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. ß 404.1520(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regula-tions.  20 C.F.R. ß 401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical

16

and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled.  20 C.F.R. ß 404.1520(e).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. ß 423(d)(2); 20 C.F.R. ß 404.1520(f).

Lentner's primary argument in support of remand is that the ALJ erred in finding that Lentner could perform her past work as a railroad clerk without first determining the requirements of that job.  Despite finding Lentner not disabled because she could perform her previous work, ALJ VerWiebe never asked Lentner about the physical or mental requirements of her former position.  Then, in his decision denying benefits, the ALJ made no findings whatsoever with respect to this job beyond the bald statement that Lentner could perform it.  The extent of his explanation was that "[t]he State Agency physicians who reviewed the evidence found the claimant could return to her past relevant work as a railway clerk.  The undersigned finds no reason to disagree." (Tr. 17)(internal citation omitted).  Because the ALJ's decision violated multiple Social Security Rulings and clear Seventh Circuit precedent, this case must be remanded.

17

According to the Social Security Administration (SSA), Social Security Rulings are "binding on all components of the Administration."  20 C.F.R. ß402.35(b)(1).  The court gives great deference to the SSA's interpretations of its own regulations as stated in the Rulings.  *See* ***Prince v. Sullivan***, 933 F.2d 598, 602 (7th Cir. 1991).  The court also relies on these Rulings as precedent "until they are either expressly superseded, modified, or revoked by later legislation, regulations, court decisions, or rulings."  ***Prince***, 933 F.2d at 602.

When the ALJ addresses a claimant's ability to do past relevant work at Step Four, SSR 82-62 first requires the ALJ to determine a "claimant's functional limitations and capacities to sit, stand, walk, lift, carry, etc."  SSR 82-62, at *2.  In turn, SSR 96-8p requires the ALJ to "describe the maximum amount of each work-related activity the individual can perform," in specific terms within seven exertional categories as well as in any relevant nonexertional capacity.  *See* SSR 96-8p, at *5-8. *See also* ***Gotz v. Barnhart***, 207 F.Supp.2d 886, 897 (E.D. Wis. 2002) (remanding in part because the ALJ considered only three of the seven factors).  Once the claimant's RFC is established, SSR 82-62 dictates that the ALJ must make a specific finding on the "physical and mental demands of the past job/occupation."  SSR 82-62 at *4.  At Step Four, this finding involves a determination of the job's demands as the claimant actually performed them. *See* SSR 82-61, at *2.  The ALJ must develop and explain any decision finding the claimant capable of past work.  SSR 82-62,

18

at *3; SSR 86-8, at *5.  According to the SSA, a decision that
the claimant can perform her job "based on a generic, occupa-
tional classification of that job, e.g., 'delivery job,' 'packag-
ing job,' etc . . . is likely to be fallacious and insupport-
able."  SSR 82-61, at *1.  Finally, the ALJ must make a "finding
of fact that the individual's RFC would permit a return to his or
her past job or occupation."  SSR 82-62, at *4.  The finding
requirements set forth in SSR 82-62 are strictly enforced by the
Seventh Circuit.  *See* **Prince**, 933 F.2d at 602-03.  *See also*
**Cunningham v. Massanari**, No. 00 C 5137, 2002 WL 5658, at *3-4
(N.D. Ill. 2002).  *See also* **Gotz**, 207 F.Supp.2d at 898 (remanding
in part because the ALJ made no exertional finding with respect
to the claimant's job).

Lentner carries the burden of establishing her disability at
Step Four.  *See* 20 C.F.R. ß404.1520.  However, ALJ VerWiebe's
explanation with respect to Lentner's ability to perform her past
work is totally deficient under the evaluative process set forth
by the Social Security Rulings.  In addition, the ALJ erred in
making an imprecise RFC determination that Lentner could lift and
carry 10-20 pounds, sit for "prolonged" periods, and stand and
walk for "short" periods.  *See* SSR 96-8p.  These errors leave the
court at a loss as to what functional ability the ALJ decided
Lentner actually had, let alone the basis of his decision.  (Tr.
18) For example, ALJ VerWiebe failed to address two of the seven
exertional categories.  *See* 96-8p, at *5.  *See also* **Gotz**, 207
F.Supp.2d at 897.  In addition, the court notes that the RFC with

which ALJ VerWiebe agreed states that Lentner could occasionally
lift 50 pounds, frequently lift 25 pounds, and stand or walk for
about six hours a day.  (Tr. 272) Yet the only evidence in the
record regarding the exertional requirements of Lentner's job was
her Disability Report from September 2000, in which she stated
that the job required her to walk for one and one-half hours,
stand for two and one-half hours, stoop for one and one-quarter
hours, write, type, or handle small objects for at least eight
hours, frequently lift 10 pounds, and lift 15 pounds at most.
(Tr. 79) Lentner stated that she could not perform these tasks
because of her physical condition.  (Tr. 77-79) This court has no
means of evaluating the logic of the ALJ's decision without, at
the least, an explanation as to (1) what a "short" or "prolonged"
period of time is or (2) why the ALJ favored a state agency
doctor's conclusion that Lentner could perform greater exertion
than required in the job she stated she no longer could perform.
Although the court highlights these points, they are not the only
gaps in the ALJ's analysis.  *See Zurawski v. Halter*, 245 F.3d
881, 887 (7th Cir. 2001); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th
Cir. 1995) (finding that the ALJ must articulate, at some minimum
level, his analysis of the evidence).  This case must be remanded
for proceedings consistent with the Social Security Rulings.

On remand, the ALJ also must address Lentner's depression.
Lentner's counsel raised this condition, but did not specifically
develop it, during the hearing.  (Tr. 28) A claimant who is
represented by counsel is presumed to have presented his best

case. ***Glenn v. Secretary of Health and Human Services***, 814 F.2d 387, 391 (7th Cir. 1987). However, Lentner did not waive the issue by failing merely to develop it fully before the ALJ. *See* ***Logan v. Barnhart***, 72 Fed. Appx. 488, 491 (7th Cir. 2003) (declining to decide whether a claimant waives an issue by failing to raise it with the ALJ). In addition, ALJ VerWiebe noted that depression was a component of Lentner's claim, although he did not discuss it in his opinion. (Tr. 15-18)

Lentner may be disabled now, but she must establish that she was disabled before her insured status expired on December 31, 1999, in order to receive disability benefits. *See* ***Estok v. Apfel***, 152 F.3d 636, 638 (7th Cir. 1998); ***Stevenson v. Chater***, 105 F.3d 1151, 1152 (7th Cir. 1997); ***Ottman***, 306 F.Supp.2d at 836-37. There is some evidence in the record that Lentner suffered from depression prior to 2000. Dr. Gupta diagnosed Lentner with depression in 1996 and prescribed Zoloft and Elavil. (Tr. 164, 180-82) In addition, his notes indicate that Lentner participated in a program for depression at Porter Starke, a mental health counseling center, in 1996. (Tr. 182) In 1997 and 1998, he completed Food Stamp eligibility forms stating that Lentner was disabled in part due to depression. (Tr. 160, 178) Dr. Kovalow-St. John recommended that Lentner seek psychological counseling and switched Lentner's medication from Zoloft to Prozac in 1999. (Tr. 363) Finally, although Dr. Zemansky began treating Lentner in 2000, she retroactively diagnosed Lentner with dysthemic disorder, adjustment disorder, and fibromyalgia

with an onset date of 1997.  (Tr. 249)  According to the Seventh Circuit, an ALJ is "required to consider recent evidence regarding [Lentner's] condition during her insured period of time, but [is] entitled to give dominant weight to the contemporaneous records."  *Mack v. Shalala*, No. 92-3922, 1993 WL 483309, at *1 (7th Cir. Nov. 22, 1993)(citations omitted).  *See also* *Estok*, 152 F.3d at 640.  While the Commissioner argues in her brief that this evidence does not establish a mental limitation, the ALJ made no such finding and this court will not speculate on the basis for his decision.  *See* *Gotz*, 207 F.Supp.2d at 898.

Finally, Lentner argues that the ALJ erred in evaluating Lentner's fibromyalgia and resulting pain and limitations. Because Lentner makes a number of assertions under this theory without development or citation to authority, and because the ALJ's decision on remand should contain greater explanation of his reasoning on Step Four, the court will not reach Lentner's third argument here.

—————————————

For the foregoing reasons, the Motion for Summary Judgment filed by the appellant, Judith Lentner, on April 1, 2004, is **GRANTED**.

ENTERED this 26th day of April, 2005

s/ ANDREW P. RODOVICH
United States Magistrate Judge

22